1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

10
11
12
13

MICHAEL WAYNE TURNER,
CDCR #AN-8222,

Plaintiff,

vs.

14
15
16

K. WILLIAMS and J. OLDROYD,

Defendants.

Case No.:  3:20-cv-1643-WQH-DEB

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

17

## I.  INTRODUCTION

18
19
20
21
22
23
24
25
26
27
28

On August 19, 2020, Plaintiff Michael Wayne Turner ("Plaintiff" or "Turner"), an inmate at Richard J. Donovan Correctional Facility ("RJD") and proceeding pro se, filed a civil action pursuant to 42 U.S.C. § 1983. *See* Compl., ECF No. 1. In it, he raised First, Fourth, Eighth, Thirteenth and Fourteenth Amendment claims against Defendants K. Williams, J. Oldroyd and the California Department of Correction and Rehabilitation ("CDCR") Mental Health Service. *See id.* After screening the Complaint pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A, the Court dismissed CDCR Mental Health Service as a defendant and dismissed all claims except for Plaintiff's First Amendment free exercise claims against Williams and Oldroyd contained in Counts I and III of the Complaint. ECF No. 8. On January 27, 2021, Plaintiff chose to proceed with the First Amendment claims

against Defendants J. Oldroyd and K. Williams which had survived screening. *See* ECF No. 9. On May 11, 2021, the Court directed U.S. Marshal's service pursuant to 28 U.S.C. § 1915(d) and Fed. R. Civ. P. 4(c)(3) as to Williams and Oldroyd. *See* ECF No. 10.

On February 15, 2022, Defendants filed a Motion for Summary Judgment. ECF No. 47. The Court notified Plaintiff of the requirements for opposing summary judgment pursuant to *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc), and *Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014) (en banc). ECF No. 48. On June 6, 2022, Turner filed an Opposition to Defendants' motion. ECF No. 59. Defendants filed a Reply on June 6, 2022. ECF No. 62. For the reasons discussed below, the Court grants Defendants' motion for summary judgment, and directs the Clerk of the Court to enter judgment in favor of Williams and Oldroyd.

## II.  FACTUAL BACKGROUND

The following facts are to be viewed in the light most favorable to Plaintiff.[1] *See Wright v. Beck*, 981 F.3d 719, 726 (9th Cir. 2020) (stating that on summary judgment, a court must view the facts in the light most favorable to the non-moving party). Unless otherwise indicated, the facts are undisputed.

To begin, an overview of the mental healthcare levels at Richard J is necessary. RJD provides mental health services to inmates based on three levels of care: Correctional Clinical Case Management System ("CCCMS"), the Enhanced Outpatient Program ("EOP"), and Mental Health Crisis Bed ("MHCB"). Williams Decl., ECF No. 47-2 at ¶ 5; Oldroyd Decl., ECF No. 47-3 at ¶ 6. CCCMS inmates are those with mental healthcare needs but who still function well enough to be housed with the general population. Williams Decl. ¶ 5; Oldroyd Decl. ¶ 6. EOP inmates are those with a "qualifying diagnosis" who are not functioning well in the general population. Williams Decl. ¶ 5. The MHCB

---

[1] Because Turner's Complaint is verified, it "may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).

unit is for inmates who "present a danger to self, danger to others, or are gravely disabled." *Id.*; Oldroyd Decl. ¶ 6. A patient is deemed "gravely disabled" if the patient "ha[s] a serious impairment in taking care of one's daily needs, such as showering, eating, and cell cleaning, but also can include social impairment, such as talking to people about paranoid delusions (e.g. accusing people of spying on [the patient]), misusing objects and otherwise demonstrating an inability to function in one's environment." Oldroyd Decl. ¶ 13. If an inmate needs a higher level of care than MHCB, they are transferred to a mental health hospital for acute care. Williams Decl. ¶ 5; Oldroyd Decl. ¶ 13.

During the relevant period, Williams, a licensed clinical social worker, was on staff at RJD. Williams Decl. ¶¶ 1, 2. Williams' caseload was made up of inmates in CCCMS. *Id.* at ¶ 6. She met periodically with inmates in the general population, on an as-needed bases. *Id.* Her duties included providing individual and group treatment to RJD inmates, as well as pre-release and parole board planning. *Id.* at ¶ 5. Oldroyd worked as an RJD staff psychiatrist handling MHCB admissions, discharges and medication management for inmates.[2] Oldroyd Decl. ¶ 5.

In early January 2020, Turner was housed in the general population of RJD. *See* Williams Decl. ¶ 7. Turner is an adherent of the Nation of Islam faith. Compl. at 3. On January 15, 2020, correctional staff reported that Plaintiff was acting "bizarrely" on "B Yard" and requested a mental health consult. Williams Decl. ¶ 9. Williams arrived at the yard and spoke to staff, who told Williams that Turner had come to the program offices with all of his belongings and told staff and other inmates that he had information to share. *Id*. Correctional staff told Williams that Turner stated "that the Bible, the Quran and the dictionary were giving [Turner] codes and telling him when the mothership would be picking him up." *Id.*; *see also* Defs.' Ex. B, ECF No. 47-1, at 103.

---

[2] Oldroyd worked as staff psychiatrist from October 2018 to April 2020. In May 2020, she was promoted to Senior Psychiatrist Supervisor at RJD, and was then responsible for supervising and training psychiatrists in MHCB. Oldroyd Decl. ¶ 5. Since December 18, 2020, she has been Acting Chief of Psychiatry at RJD. *Id.*

Williams met with Turner in the gym shortly thereafter to assess his condition and determine whether he might be a danger to himself or others, or "gravely disabled." Williams Decl. ¶¶ 10–11. Williams had met with Turner before on occasion, starting in the spring of 2019 and he had "seemed to be doing really well." *Id.* at ¶ 7. Prior to late 2019, Turner had been a "model inmate." *See* Defs.' Ex. B at 18, 35, 57.  And up until January 15, 2020, Williams had not noted any acute mental health symptoms on Turner's part. His behavior on that day seemed "uncharacteristic" to Williams. *Id.* at 8; *see also* Williams Decl. ¶ 7.

During Williams' January 15, 2020 evaluation, Turner was talking rapidly and making "nonsensical statements." Defs.' Ex. B at 103. According to Williams, Plaintiff was "exhibiting delusional thinking and making bizarre statements." *Id.* She noted that at one point, Turner stated: "I'm the Angel Michael," "It's codes," and "This is bigger than y'all." *Id.* Turner also mentioned his deceased grandfather, who he claimed was actually alive and living in the hills behind the prison. *Id.* Turner told Williams that he had been up all night communicating with this grandfather, who he now claimed was not deceased. *Id.* Turner made repeated references to "codes" and the "mothership." In her report, Williams noted that he denied having auditory and/or visual hallucinations. Turner also denied suicidal and/or homicidal ideation. *Id.* Turner told Williams: "I am the angel Michael and they got me in this cage. I have a bigger cause to do. I got so many people to bless…. I'm not insane. I'm not crazy. I'm not on drugs." *Id.* Williams noted that Turner was alert and cooperative and did not appear to "be in distress." *Id.* Williams' summary states that at one point during their discussion, Turner described holes in one of the gym walls as "the moon" and stated the moon was his mother and that he could see the moon and the stars through a nearby cabinet.[3]

---

[3] Turner denies telling Williams he could see through the walls. He does not, however, dispute that Williams included it in her report. *See* Pl.'s Opp'n, Ex. A, ECF No. 60-1 at 2.

Based on her assessment, Williams concluded that Turner was "gravely disabled" and should be admitted to MHCB, which treats inmates who are deemed a danger to themselves, a danger to others, or "gravely disabled." Williams Decl. ¶¶ 5, 12. Williams then called her supervising psychologist to discuss the case.[4] *Id.* at ¶ 13. Williams and her supervisor agreed that, given his condition, Turner should be referred to MHCB for diagnostic evaluation. *Id.* They called the MHCB director to discuss admitting Turner. *Id.*; *see also* Defs.' Ex. B at 8. At that point, MHCB staff took over and Williams was not involved in Turner's care again. Williams Decl. ¶¶ 13–14.

Psychologist Jessica Bailis signed the order for Turner to be admitted to the MHCB at 10:51 a.m. on January 15, 2020. Defs.' Ex. B at 8; *see also* Williams Decl. ¶ 13. Shortly after admitting Turner to the MHCB, Dr. Bailis conducted an initial evaluation of him. Bailis' observation notes state Turner exhibited "bizarre physical and verbal" behavior and was "disruptive." *Id.* Later the same day, Bailis described Turner as "agitated," "rambling," "crying," engaged in "bizarre," "grandiose," and "magical thinking." *Id.* at 76. Turner cooperated with Bailis during the interview, but he was frustrated that he was without his "codes." *Id.* Bailis located Turner's Bible, Quran, and dictionary and gave them to him. Turner then "de-escalated" and returned to his cell without incident. *Id.* Bailis noted that for the remainder of the afternoon, "[Plaintiff] could be overheard pointing out the 'moon and stars' on the wall to any staff walking past." *Id.* At the time, Bailis suspected Turner was suffering from "likely substance induced intoxication." *Id.*

---

[4] Under standard procedure, when an inmate is in mental health crisis, a Crisis Intervention Team is notified. The inmate is then evaluated by a member of the Crisis Intervention Team, designated the "primary clinician." The primary clinician determines whether the inmate meets the criteria for MHCB. The primary clinician then discusses the admission with the psychology supervisor. The psychology supervisor, primary clinician and Director of the MHCB (a psychologist) conference and decide whether to admit the inmate to MHCB. If the inmate is deemed to meet the eligibility criteria for MHCB admission, the inmate is taken to the Triage and Treatment area, evaluated for medical clearing and, if cleared, then admitted to the MHCB. The admission order is placed by either the primary clinician, one of the clinicians in the MHCB or the MHCB Director. Oldroyd Decl. ¶¶ 7–8.

The next day, January 16, 2020, psychiatrist Anita High conducted Turner's initial psychiatric evaluation at MHCB. *Id.* at 64, 101; Oldroyd Decl. ¶ 16. Dr. High noted that Turner reported having "visions ever since he looked at the moon a few weeks ago." Defs.' Ex. B at 102. High's notes also indicate Turner stated:

> I know things I never knew before like calculus I can find out everything about everything. . . My grandfather created an element[.] Are you familiar with the motherships[?] [They] have 1500 baby planes. My grandfather started communicating with me since I've been here. The building was 9 my cell was 207 which equals 9.

*Id.* When asked about his mental health history, Plaintiff responded "I don't have anything. I'm not suicidal. I have a lot going on right now. I still see signs" *Id.* Dr. High noted that Turner was "see[ing] patterns in everything" and "demonstrating ideas of reference," which is the "delusional belief that general events are personally directed at oneself." *Id.*; *see also* Oldroyd Decl. ¶ 16. For instance, Turner told Dr. High it was significant that there were 40 lights in the housing unit and he was 40 years old. Defs.' Ex. B at 102. Based on her evaluation of Turner and his history of drug overdose, Dr. High's working diagnosis at the time was "substance abuse psychosis." *Id.* Dr. High concluded that Turner should remain at MHCB and ordered a psychiatrist follow-up the next day. *Id.*

Dr. High saw Turner again on January 17, 2020. She found him to be cooperative but hyperverbal, with tangential thoughts and complex delusions. Defs.' Ex. B at 100. He still believed he was the "Angel Michael." *Id.* Dr. High noted Plaintiff had not been sleeping well (he was observed awake at 3:00 a.m. and 6:00 a.m.). In addition, staff had observed Turner "rambling" about seeing codes in everything. *Id.* Turner was heard stating, "I'm so tuned with the world . . . I know people don't want to see the Angel Michael in this form but here I am." *Id.* When asked why he was not sleeping, Turner replied, "The dictionary has my grandmother's name." *Id.* Dr. High concluded Turner should remain at the MHCB level of care. *Id.*

Turner was seen by another psychiatrist, Dr. Deam, on January 19, 2020. Turner spoke in "paranoid tones." *Id.* at 98. Turner had put his mattress on the floor of his cell and

was using the plastic bed frame to lay out documents, but he would not discuss the significance of them. *Id.* Turner was refusing to take his prescribed Cymbalta,[5] and was not willing to consider alternative medications. *Id.* Dr. Deam agreed that Turner should remain at the MHCB level of care. *Id.*

Turner was seen by Oldroyd for the first time on January 22, 2020. *Id.* at 95–97. By that time, Turner had been in MHCB for a week. Oldroyd summarized the visit as follows:

> [Turner] reports being "happy and blessed." He went on to talk about being on the earth to stop violence, get world peace, [and] feed all the people. [He] admitted to seeing red lights coming into the prison, believing that they are the means to which his grandfather is communicating with him. He also described how his grandfather has control over the prison and [it] was actually designed by him as well. He talks of the "mothership" which is the Nation of Islam, and [stated] its purpose was to protect others. [Turner went] on to talk about going back to the pyramids when he closes his eyes and have a 3rd eye. The 3rd eye is for ESP and for clairvoyance allowing him to travel back in time. He then talked about the "Secret Society," which is government-controlled technology that comes directly from the "mothership." [Turner] states that he does not know the purpose of the "Secret Society." He denies [being] paranoid but endorses ideas of reference. He sees planes in the sky and believes that his grandfather is tapping into [his] mind and communicating with him. He writes words on paper and his grandfather can communicate with him directly from the paper. He believes that when his new TV stopped working, it was "preparation for things to come." [Turner] has grandiose ideas, stating that he can make the stars appear and that he is playing the role of the Angel Michael to bring about help and goodness in the world. He also describes the ability to move clouds. [Turner] is having [visual hallucinations] of the "mothership" but denies having [auditory hallucinations] . . . His thinking is disorganized with circumstantiality and perseveration. Speech is normal. Mood is mildly euphoric. He denies [suicidal ideation/homicidal

---

[5] The Court takes judicial notice that Cymbalta, also known as Duloxetine, is a "serotonin norepinephrine reuptake inhibitor (SNRI) antidepressant" medication. *See* Physician's Desk Reference, https://www.pdr.net/drug-summary/Cymbalta-duloxetine-288#3 (last visited Aug. 22, 2022). *See United States v. Howard*, 381 F.3d 873, 880 & n.7 (9th Cir. 2004) (taking judicial notice of the effects of certain medications listed in the Physician's Desk Reference); *see also Lolli v. County of Orange*, 351 F.3d 410, 419 (9th Cir. 2003) ("Well-known medical facts are the types of matters of which judicial notice may be taken.").

7

ideation]. Turner was seen in [Recreational Therapy] climbing on the table today to see the lights and talking to them in staccato sentences. The Warden had to come and tell him to get down which he did without incident.

*Id.* at 96–97.

After meeting with Turner, Oldroyd settled on a working diagnosis of "schizophreniform disorder." *Id.* at 95; *see also* Oldroyd Decl. ¶ 22. Oldroyd also noted that "substance use disorder" could not be ruled out because, although Turner denied substance abuse, he was refusing a urine test. Defs.' Ex. B at 95. Schizophreninform disorder is a mental illness which presents with psychosis, during which an individual cannot tell what is real from what is imagined, sees or hears things that are not there, and has a disorganized thought process. Oldroyd Decl. ¶ 22. In making her diagnosis, Oldroyd relied on her experience and Turner's medical history. Oldroyd also noted that Turner had received three rule violations in quick succession over the past few months—all of which were suggestive of psychotic symptoms and which were out of character for Turner, who had previously been a "model inmate." *Id.*; *see also* Defs.' Ex. B at 18, 35, 57. She also noted: "starting PC2602[6] for [grave disability] and possible [danger to self]/[danger to others] – psychotropic medication indicated." Defs.' Ex. B at 95.

Oldroyd met with Turner a second time on January 23, 2020. *Id.* at 91. Turner exhibited symptoms similar to those she observed during her previous visit. *Id.* Turner reported seeing a red light that was from the "mother ship" and was "communicating to him from Allah." *Id.* at 92. Turner also described how he was feeling prior to being admitted to MHCB on January 15, 2020. Turner told Oldroyd his mind was getting "flooded" with overwhelming knowledge and he "looked at the moon and felt his heart starting to change." *Id.* Turner said he then knew he was able to "crack the code." *Id.* at

_____

[6] California Penal Code section 2602 authorizes involuntary medication of state inmates on a non-emergency basis where certain criteria are met. Cal. Penal Code § 2602(c). In addition to other requirements, the inmate is entitled to a hearing before an administrative judge, with the assistance of counsel. Cal. Penal Code § 2602(c)(5)–(6).

92–93. Turner said he "decided it was time to leave prison to do his work saving the gangs from violence [and] feeding starving people." *Id.* at 93. Turner packed his belongings and went to talk to the Warden. When he got to the program office, Turner shared his papers with numbers and "codes" with correctional officers there. *Id.*

During the same January 23, 2020 appointment, Oldroyd discussed California Penal Code section 2602 and the procedure for involuntary medication of mental health inmates. *Id.* Turner became "quietly argumentative" and asked Oldroyd if she had an agenda, and whether she believed in God. Turner insisted that everything he was telling Oldroyd was true and he was not psychotic or crazy. *Id.* When Oldroyd explained that a § 2602 petition was going to be filed so he could be medicated despite his refusal, Turner stated, "well then the wrath of Allah will come down on you for this injustice." *Id.* Oldroyd noted: "working on non-urgent PC2602 for grave disability, pending completion—antipsychotic medication indicated." *Id.* at 92.

On January 24, 2020, psychiatrist H. Greenwald, the Chief of Mental Health for RJD, prepared a referral for Turner to receive inpatient psychiatric care pursuant to Penal Code § 2684, which sets out the procedure for transfer of mentally ill prisoners to a state hospital for treatment. *Id.* at 82. On the same day, the California Penal Code § 2602 petition, signed by Oldroyd, was filed. Pl.'s Opp'n, Ex. B, ECF No. 60-2 at 11–14. A hearing date was set for February 18, 2020. *Id.* at 11.

Oldroyd saw Turner again on January 27 and 30, 2020. Defs.' Ex. B at 85–88; Oldroyd Decl. ¶¶ 29–30. Oldroyd's notes state Turner continued to exhibit the same behavior and symptoms as during his previous visits. Defs.' Ex. B at 85–88. During the January 27 visit, Oldroyd noted Turner "was internally stimulated looking up in the sky and talking to what he was experiencing in the sky." *Id.* at 87. At that point, Turner was refusing to take psychotropic medication but he was aware that a section 2602 petition was in the works. *See id.* at 88, 93. Turner told Oldroyd he would not talk to her "because you are making me take medication." *Id.*; *see also* Oldroyd Decl. ¶ 29. When Oldroyd saw Turner on January 30, 2020, he told her "I have nothing to say to you, so please go away."

Defs.' Ex. B at 86. Oldroyd noted that during a group meeting two days prior, Turner had told her she needed to "get a Bible because [you] really don't understand these spiritual things or you would be able to see what I see."[7] *Id.* at 86.

On February 5, 2020, Turner was transferred from RJD MHCB to California Health Care Facility ("CHCF") to receive a higher level of care. *Id.* at 12; *see also* Oldroyd Decl. ¶ 28. Oldroyd had no further involvement with Turner's care or treatment. She did, however, appear at Turner's Penal Code § 2602 hearing on February 20, 2020, during which an administrative judge was to determine whether Turner could be involuntarily medicated. The administrative judge ultimately ruled that Turner was not "gravely disabled" and denied the § 2602 petition. In doing so, the Medication Court Administrator stated that "the treating psychiatrist was not able to demonstrate [that Turner] lack[ed] insight regarding his need for psychiatric medication. The patient showed minimal to no signs of grave disability." Pl.'s Opp'n, Ex. B at 27. On March 5, 2020, Turner was transferred from CHCF to Mule Creek State Prison's Enhanced Outpatient Unit. Oldroyd Decl. ¶ 31.

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). While Turner bears the burden of proof at trial, Defendants, as the moving parties, bear the initial burden of informing a court of the basis for their motion and of identifying the portions of the record that demonstrate an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it might affect the outcome of the lawsuit under governing

---

[7] On January 28, 2020, psychologist Bailis met with Turner and noted Turner expressed "frustration" with Oldroyd and stated Turner believed she was "working for Satan" and "trying to mess with my brain" by prescribing medication. Defs.' Ex. B at 113. Turner stated that Oldroyd did not understand that he was a messenger of God who was sent to help others. Turner believed Oldroyd had "bad intentions." *Id.*

law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

If Defendants meet their initial responsibility, the burden then shifts to Turner to establish a genuine dispute as to any material facts that exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). To establish the existence of this factual dispute, Turner must present evidence in the form of affidavits and/or admissible discovery material to support his contention that a genuine dispute of material fact exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11.

District courts must "construe liberally motion papers and pleadings filed by pro se inmates and . . . avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). However, if Plaintiff "fails to properly support an assertion of fact or fails to properly address [Defendant's] assertion of fact, as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . .." Fed. R. Civ. P. 56(e)(2). Plaintiff, as the opposing party, may not rest solely on conclusory allegations of fact or law. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). A "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" *Anderson*, 477 U.S. at 249–50; *Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2006).

### IV.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Williams and Oldroyd argue there is no genuine dispute of material fact as to whether they violated Turner's First Amendment right to exercise his religion when he was transferred to MHCB, and ultimately to CHCF, based on a determination that he was suffering from a mental health emergency and "gravely disabled." Defs.' P. & A. Supp. Mot. Sum. J., ECF No. 47 ("Defs.' P. & A."). Specifically, Williams and Oldroyd argue that summary judgment is warranted because there is no triable issue that (1) Williams caused Turner to be transferred and (2) Williams and Oldroyd's actions were taken in pursuit of a legitimate penological interest and not based on Turner's religious exercise. *Id.*

at 12–18. Defendants also contend they are entitled to qualified immunity. *Id.* at 19–20.

## A.    First Amendment Free Exercise

Prisoners "retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citation omitted); *see also Cruz v. Beto*, 405 U.S. 319, 322 & n. 2 (1972). A prisoner's right to freely exercise his religion, however, is limited by institutional objectives and by the loss of freedom that comes with incarceration. *O'Lone*, 482 U.S. at 348. To implicate the Free Exercise Clause, a prisoner must show that the belief at issue is both "sincerely held" and "rooted in religious belief." *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994); *see also Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008) (noting the Supreme Court's disapproval of the "centrality" test and finding that the "sincerity" test in *Malik* determines whether the Free Exercise Clause applies).

If the inmate makes an initial showing of a sincerely held religious belief, he must establish that prison officials substantially burdened the practice of his religion by preventing him from engaging in conduct that he sincerely believes is consistent with his faith. *Walker v. Beard*, 789 F.3d 1125, 1138 (9th Cir. 2015); *Shakur*, 514 F.3d at 884–86 (9th Cir. 2008); *Malik*, 16 F.3d 330, 333 (9th Cir. 1994). "A substantial burden . . . place[s] more than an inconvenience on religious exercise; it must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jones v. Williams*, 791 F.3d 1023, 1031–32 (9th Cir. 2015) (alteration in original) (quoting *Ohno v. Yasuma*, 723 F.3d 984, 1011 (9th Cir. 2013)).

"Once a claimant demonstrates that the challenged regulation impinges on his sincerely held religious exercise, the burden shifts to the government to show that the regulation is 'reasonably related to legitimate penological interests.'" *Jones v. Slade*, 23 F.4th 1124, 1144 (9th Cir. 2022) (quoting *Walker*, 789 F.3d at 1138); *see also O'Lone*, 482 U.S. at 349; *Shakur*, 514 F.3d at 884–88. In determining whether a legitimate penological interest exists, the Supreme Court has articulated four factors to be considered: (1) whether

3:20-cv-1643-WQH-DEB

there is a valid, rational connection between a state interest and the prison regulation; (2) whether prisoners have an alternative method of engaging in religious practice; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates; and (4) the absence of ready alternatives to the challenged regulation. *Turner v. Safley*, 482 U.S. 78, 89-90 (1987); *see also Ward v. Walsh*, 1 F.3d 873, 876 (9th Cir. 1993).

Here, Defendants do not claim that Turner's religious beliefs, as a member of the Nation of Islam, are not sincerely held. Nor do they contend that he was not "substantially burdened." Rather, they argue that summary judgment is proper here because there is no genuine factual dispute as to whether Williams caused Turner's religious beliefs to be burdened. They further assert that there is no triable issue because the actions of Williams and Oldroyd were reasonably in pursuit of legitimate penological interests. *See* Def.'s P. & A. at 12–18.

### 1.      Sincerely Held Belief

As noted above, to implicate the Free Exercise Clause, Turner must satisfy an initial burden by showing his belief is "sincerely held" and "rooted in religious belief." *Malik*, 16 F.3d at 333 (quoting *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981)). Plaintiff states, and Defendants do not dispute, that he has a sincerely held religious belief in the tenets of the Nation of Islam. *See* Compl., ECF No. 1 at 3. Turner attests that he is a faithful follower of the Nation of Islam, which teaches, among other things, the existence of a "mother plane" as "an actual tenet of [the Nation of] Islam." *Id.*; *see also* Pl.'s Opp'n, Ex. C at 13. As Turner explained to one of his therapists, as a member of the Nation of Islam, Turner's faith includes beliefs based on Elijah Muhammed's book "The Fall of America," which discusses the existence of a "mother plane," an enormous round ship that flies down to earth every six months-to-a-year, and which will also come "when it's time for complete destruction." Pl.'s Opp'n, Ex. C at 19. Turner asserts that it is a Nation of Islam belief that "there are 1500 baby planes that come off the mother plane and those are what people confuse for [unidentified flying objects]." *Id.* Turner states he is sincere in his beliefs. *Id.* at 1, 13, 19; *see also* Compl. at 3, 5.

Defendants have presented no evidence to create a genuine factual dispute that Turner lacks a sincerely held religious belief. *See Matsushita*, 475 U.S. at 586. As such, based on Turner's sworn statement, the Court finds he has satisfied his initial burden of showing he possesses a sincerely held belief in the tenets of Nation of Islam. *See Obataiye-Allah v. Steward*, 857 Fed. Appx. 403, 2021 WL 2105494 (9th Cir. 2021) (concluding the plaintiff inmate's declaration was sufficient to establish he had a sincerely held belief in the principles of the Nation of Islam).

### 2.   Substantial Burden

In his verified Complaint, Turner alleges his right to practice his Nation of Islam faith was burdened by Williams and Oldroyd when he was removed from the RJD general population, admitted to MHCB on January 15, 2020 and subsequently transferred to the CHCF on February 5, 2020. *See* Compl. at 3–6.

"A substantial burden need not actually force a litigant to change his practices; a violation may occur where the state denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Walker*, 789 F.3d at 1135. Here, Turner states he was punished for simply expressing tenets of his beliefs and his ongoing a "spiritual awakening." Pl.'s Opp'n, Ex. A at 2. After being transferred to MHCB and CHCF, Turner attests he was afraid to practice his religion because he had been deemed "gravely disabled" by Williams and Oldroyd when he expressed the tenets of his faith. Compl. at 5. In addition, having been transferred out of RJD general population, Turner was no longer able to participate in certain programs and activities. Evidence presented by both parties indicates that prior to his transfer to MHCB, Turner had been slated to enter the Male Community Reentry Program, based on his history of good behavior and programming. Defs.' Ex. B at 57; *see also* Pl.'s Opp'n, Ex. A at 5. After his transfer out of general population, he was no longer eligible to enter the program. Pl.'s Opp'n, Ex. A at 5. The Court finds, based on the evidence presented, when viewed in the light most favorable to Turner, he was substantially burdened by his transfer out of RJD general population for mental health treatment. *See*

1    *Walker*, 789 F.3d at 1135.

2         **3.     Causal Connection Between Williams' Actions and Plaintiff's Burden**

3         Williams contends she is entitled to summary judgment because she did not

4    personally order Turner's transfer from the general population to the MHCB. Defs.' P. &

5    A. at 12–13. Williams claims there is no genuine dispute of material fact as to her liability

6    because, even assuming Turner's sincere religious beliefs were substantially burdened, she

7    did not cause the burden because she did not cause Turner to be transfer. *Id*.

8         In order to obtain relief under section 1983, a plaintiff must establish a causal

9    connection between the purported constitutional violation and alleged injury. *Est. of Brooks*

10   *ex rel. Brooks v. United States*, 197 F.3d 1245, 1248 (9th Cir. 1999) ("Causation is, of

11   course, a required element of a § 1983 claim"); *see also Starr v. Baca*, 652 F.3d at 1207.

12   A "causal connection may be established when an official sets in motion a 'series of acts

13   by others which the actor knows or reasonably should know would cause others to inflict'

14   constitutional harms." *Preschooler II v. Clark Cnty School Bd of Trustees*, 479 F.3d 1175,

15   1183 (9th Cir. 2010) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)); *see*

16   *also Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018); *Harris v.*

17   *Roderick*, 126 F.3d 1189, 1196 (9th Cir. 1997); *Merritt v. Mackey*, 827 F.2d 1368, 1371

18   (9th Cir. 1987). This standard of causation "closely resembles the standard 'foreseeability'

19   formulation of proximate cause." *Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d 1350, 1355

20   (9th Cir. 1981); *see also Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir.

21   2008); *Wong v. United States*, 373 F.3d 952, 966 (9th Cir. 2004). When making the

22   causation determination, the court "must take a very individualized approach which

23   accounts for the duties, discretion, and means of each defendant." *Leer v. Murphy*, 844

24   F.2d 628, 633–34 (9th Cir. 1988).

25        While Williams did not personally sign the order admitting Turner to MHCB on

26   January 15, 2020, she made the initial determination that Turner was "gravely disabled."

27   Defs.' Ex. B at 103; Williams Decl. ¶ 9. A trier of fact could reasonably find that Williams'

28   determination set in motion a series of events that resulted in Turner's admission to MHCB.

Indeed, Williams states the purpose of her evaluation of Turner was to "assess[] him to determine whether he might be a danger to self, danger to others or gravely disabled." Williams Decl. ¶ 11. As noted above, MHCB is specifically for inmates who have been deemed a danger to themselves or other, or are "gravely disabled." *Id.* at ¶ 5. Williams concluded that given Turner's condition, he "should be admitted to MHCB." *Id.* at ¶ 13. Williams then contacted her supervisor to discuss the case and they both agreed that Turner should be referred to MHCB, based on Williams' determination that he was "gravely disabled." *Id*. Williams and her supervisor then "called the MHCB Director to discuss admitting Turner to MHCB." *Id.* At that point, MHCB staff took over and custody staff escorted Turner to the MHCB. Defs.' Ex. B at 8.

While Williams did not sign the order admitting Turner to the MHCB, her determination that Turner was gravely disabled was a crucial factor in his being transferred there. A reasonable jury could find that Williams "set in motion the series of acts" by which she knew or reasonably should have known would cause Turner to be removed from RJD general population and transferred to MHCB, which, in turn, created a substantial burden on his religious exercise. *See Preschooler II*, 479 F.3d at 1183.

### 4.   Legitimate Penological Interest

Both Williams and Oldroyd argue that, even assuming Turner's sincerely held belief was substantially burdened, the challenged conduct did not offend the First Amendment because it was reasonably related to legitimate penological interests.[8] Defs.' P. & A. at 15–

---

[8] Williams and Oldroyd also assert that summary judgment should be granted because they both based their opinions about Turner's mental healthcare needs on their professional experience, not his religious expression. Defs.' P. & A. at 13–14. Defendants cite no legal authority for this proposition. Turner argues Defendants based their opinions on his expression of Nation of Islam tenets, which Williams and Turner found "bizarre." He contends that the statements Defendants found to be delusional were actually expressions of well-established Nation of Islam beliefs. *See* Compl., at 3–6. As noted above, to obtain relief, Turner need only show his sincere religious beliefs were substantially burdened by Defendants. If he makes such a showing, Defendants must establish that their conduct was "reasonably related to a legitimate penological interest." *See*

16

18. As discussed above, determining whether a legitimate penological interest exists, the Supreme Court has articulated four factors to be considered: (1) whether there is a valid, rational connection between a state interest and the prison regulation; (2) whether prisoners have alternative means of engaging in religious practice; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates; and (4) the absence of ready alternatives to the challenged regulation. *Turner*, 482 U.S. at 89–90; *see also Ward*, 1 F.3d at 876.

a.   Valid, Rational Connection

The Court must first consider whether there is "valid, rational connection" between the challenged conduct and "the legitimate government interest put forth to justify it." *Turner*, 482 U.S. at 89. "The first *Turner* factor is the most important." *Jones v. Slade*, 23 F.4th 1124, 1135 (9th Cir. 2022). To evaluate whether a valid, rational connection exists, the Court must determine "whether the governmental objective underlying the policy is (1) legitimate, (2) neutral, and (3) whether the policy is 'rationally related to that objective.'" *Id.* (quoting *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999)). The initial burden is on defendants to put forth a "common sense" or intuitive connection between their challenged conduct and a legitimate penological interest. *Frost v. Symington*, 197 F.3d 348, 357 (9th Cir. 1999). If the defendants satisfy the initial burden, the inmate must present enough evidence to refute the connection between the conduct and the objective. If the inmate fails to do so, the court is to presume the governmental objective is legitimate and neutral and the first *Turner* prong is satisfied. *See Ashker v. California Dept. of Corrections*, 350 F.3d 917, 923–24 (9th Cir. 2003); *Frost*, 197 F.3d at 357.

Williams and Oldroyd assert two, overlapping government interests: (1) complying with its obligations under the Eighth Amendment and (2) maintaining order and the safety of inmates (including Turner) and staff. Defs.' P. & A. at 16–17.

---

*Jones*, 23 F.4th at 1144. To the extent Defendants argue their conduct was based on medical opinion, the Court addresses it in section IV(A)(4)(a) of this Order.

17

First, the Eighth Amendment requires state actors to protect the health and safety of the inmates in their care. *See Farmer v. Brennan*, 511 U.S. 825, 837, 842 (1994). This includes an obligation of prison staff to provide mental health care that meets "minimum constitutional requirements." *Brown v. Plata*, 563 U.S. 493, 501 (2011); *see also Doty v. Cty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) (holding that "the requirements for mental health care are the same as those for physical health care needs"); *see also Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) (analyzing mental health care requirements as part of general health care requirements). The Eighth Amendment is violated when officials are deliberately indifferent to an inmate's serious mental health need. *Doty*, 37 F.3d at 546; *see also Capps v. Atiyeh*, 559 F. Supp. 894, 916 (D. Ore. 1983) ("[A]n inmate suffers [E]ighth [A]mendment pain whenever he must endure an untreated serious mental illness for any appreciable length of time."). Compliance with the Eighth Amendment is a valid and neutral objective; and prison officials have a legitimate interest in doing so. *See Jones*, 23 F. 4th at 1135; *see also Warsoldier v. Woodford*, 418 F.3d 989, 1000 (9th Cir. 2005) (stating prisons have an interest in "protecting inmate health").

Moreover, courts have held that security, order, and rehabilitation are all legitimate penological interests. *See Thornburgh*, 490 U.S. at 408 (internal citations omitted); *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995) (noting legitimate penological interests include "security, order, and rehabilitation"). Thus, the question here is whether there is a "rational connection" between the legitimate interest in protecting the health and safety of inmates (including Turner) and the decisions made by Williams and Oldroyd related to Turner's behavior in January 2020.

Williams attests that on January 15, 2020, she received a request from custody staff for an "urgent consult" with Turner. Williams Decl. ¶ 9. Custody officers reported that Turner had shown up in the program office with all his belongings and was acting strangely. Turner reportedly told staff and other inmates in the office that the Bible, the Quran, and the dictionary were giving him codes and telling him when the mothership would be picking him up. *Id*. When Williams met with Turner in the RJD gym, she noted that Turner

was speaking rapidly, "exhibiting delusional thinking and making nonsensical statements." *Id.* at ¶ 10. Turner repeatedly referred to "codes" and, at one point, stated: "I'm the Angel Michael and they got me in this cage. I have a bigger cause to do. I got so many people to bless." *Id.* Williams states Turner explained that he had been awake all-night crying because he was communicating with this deceased grandfather, who Turner now realized was not dead. *Id.* Williams states Turner "was facing a cabinet and reported he was able to see the moon and the stars through the cabinet." *Id.* Williams found Turner's behavior "uncharacteristic." *Id.* at ¶ 7; *see also* Defs.'s Ex. B at 8. He had previously been a model inmate. Defs.'s Ex. B at 8, 18, 35.

Given Turner's disruptive behavior and grandiose statements, which notably appeared to be new behavior for Turner, a jury could find that it was not unreasonable for Williams to believe Turner needed the mental healthcare provided by MHCB. In addition, a jury could find that, because Turner was making statements which custody staff and other inmates found bizarre and distracting, segregating him from the general population while getting him mental healthcare was rationally related to the prison's interest in providing Turner with adequate healthcare, as required under the Eighth Amendment. Segregating Turner from the general population was also rationally related to the state's interest in maintaining order in the prison and protecting the safety of all inmates and staff.

In his Opposition, Turner denies some of the conduct Williams attributes to him. Turner states he never told Williams that he could see through walls. *See* Pl.'s Opp'n, Ex. A at 2. This, however, does not undermine the Court's conclusion. Turner does not dispute that he proclaimed himself to be the Angel Michael, was obsessed with "codes," declared his deceased grandfather was alive and communicating with him, and appeared in the program office with all his belongings while exhibiting other unusual behavior. Regardless of whether it was informed by his religious beliefs, Turner's behavior was potentially disruptive and suggested a concerning change in disposition. Thus, even viewing the evidence in the light most favorable to Turner, the evidence shows that Williams' conduct was rationally related to the government's interest in protecting inmate health and safety.

Similarly, evidence in the record shows Oldroyd based her mental health evaluations of Turner on his behavior as opposed to his religious beliefs. When Oldroyd met with Turner on January 22, 2020, he believed "red lights" coming into the prison were a means by which his deceased grandfather was communicating with him. Defs.' Ex. B at 95. Turner referred to a "secret society" controlled by the government. Oldroyd also noted that Turner had been found standing on a table earlier that day and "the warden had to tell him to get down." *Id.* at 96. Turner told Oldroyd he was not sleeping because "there was too much to do." *Id.* Based on her evaluation, she noted Turner was exhibiting paranoia, endorsing "ideas of reference" (the "delusional belief that general events are personally directed at oneself") and making grandiose statements. *See* Defs.' Ex. B at 95–96; *see also* Oldroyd Decl. ¶¶ 19–21. As such, Oldroyd's decision that Turner needed continued mental health intervention was rationally related to the government's interest in providing adequate mental healthcare to Turner, safeguarding institutional order, and protecting the safety of all inmates and staff.

Having found Oldroyd has satisfied her initial burden, Turner must present enough evidence to refute the connection between the challenged conduct and the objective. *See Ashker*, 350 F.3d at 923–24; *Frost*, 197 F.3d at 357. Turner argues that Oldroyd only spoke to him for "3 to 4 minutes." Pl.'s Opp'n, Ex. A at 12. Turner states that Oldroyd "misdiagnosed" him as being gravely disabled. *Id.* He points to the February 20, 2021 determination by an administrative law judge, denying the § 2602 petition after concluding that Plaintiff was not "gravely disabled." *See* Pl.'s Opp'n, Ex. B at 27–29. But even viewed in the light most favorable to Turner, the evidence shows Oldroyd relied on not just her interview with Turner, but also a review of his medical history, including reports provided by Williams and other mental health professionals who evaluated or observed Turner during his time in MHCB. Oldroyd's opinion that Turner needed to be in MCHB was shared by Dr. High and Dr. Deems. *See* Defs.' Ex. B at 98, 100, 102. The administrative law judge's subsequent decision that there was insufficient evidence that Turner was "gravely disabled" does not undermine the connection between Oldroyd's conduct and the

state's interest. To the extent Oldroyd's medical opinion caused Turner to remain at MHCB or caused his subsequent transfer to CHCF, it was nonetheless rationally related to the government's interest in providing mental healthcare that comports with the Eighth Amendment and with the prison's interest in maintaining order, Turner's safety, and the safety of other inmates and staff. Therefore, the Court finds the first Turner factor weighs heavily in favor of Williams and Oldroyd.

        b.    Alternate Means

The second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 89–90. In the context of free exercise claims, the relevant inquiry under this factor is not whether the inmate has an alternative means of engaging in the particular religious practice that he claims is being affected; rather, the question is whether the inmate has been "denied all means of religious expression." *Ward*, 1 F.3d at 877. The second *Turner* factor has been deemed satisfied where the prisoner retains "the ability to participate in other significant rituals and ceremonies" of his faith, even if some aspects of religious practice are impinged upon. *Id*.

Williams and Oldroyd present evidence that in the MCHB, inmates' religious beliefs and practices are "accommodated as much as possible." *See* Oldroyd Decl. ¶ 10. Inmates are not permitted to attend group religious services but can request chaplain visits.[9] *Id.* MHCB inmates are permitted to pray in their cells and "generally allowed to have religious literature, unless it is making their psychosis worse or they are misusing in (i.e., tearing it up or throwing it)." *Id.* Notations in Turner's medical records indicate he was given his Bible, Quran and a dictionary the day he was transferred to the MHCB. Defs.' Ex. B at 76, 78, 98, 121. Turner also had access to outdoor recreation while in MHCB, where he was seen praying on several occasions. *Id.* at 78, 123, 124.

---

[9] Defendants do not indicate whether a Nation of Islam chaplain was requested by, or made available to, Turner. In any event, the Constitution does not necessarily require prisons to provide each inmate with the religious counselor with beliefs wholly congruent to his own. *Johnson v. Moore*, 948 F.2d 517, 520 (9th Cir. 1991).

Turner argues generally that the expression of his religious beliefs while in MHCB was seen as an indication that he was delusional by both Williams and Oldroyd. Compl. at 3, 5. With regard to Williams, there is no evidence she had any part in Turner's care after he was admitted to MHCB on January 15, 2020. On that date, records indicate Turner had access to his religious texts, including the Bible and Quran, was permitted to read them, pray and request a chaplain. Defs.' Ex. B at 76, 78, 98, 121. There is no evidence that Williams denied the Turner the ability to participate "significant rituals and ceremonies" of the Nation of Islam. *See Ward*, 1 F.3d at 877.

As for Oldroyd, who did treat Turner while he was in MHCB, medical records indicate Turner retained possession of his Bible and Quran during his 20-day stay. Defs.' Ex. B at 76, 78, 98, 121. Furthermore, the Ninth Circuit has distinguished between curtailing "various ways of expressing belief, for which alternative ways of expressing belief may be found" and requiring the inmate to "defile himself, according to the believer's conscience, by doing something that is completely forbidden by the believer's religion." *See Ward*, 1 F.3d at 878. While Oldroyd deemed some of Turner's religious declarations, such as "I am the Angel Michael," as an indication he was suffering from grandiosity and/or delusions, Turner had other ways to practice the Nation of Islam faith, such as reading his religious texts. Turner presents no evidence that he was unable to fulfill any "commandments" of the Nation of Islam. *See id.* Therefore, the second factor weighs in favor of both Williams and Oldroyd.

### c.   Impact of Accommodation

The third *Turner* factor requires the Court to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally." *Turner*, 482 U.S. at 91; *Washington v. Harper*, 494 U.S. 210, 225 (1990). The accommodation Turner sought in this case was simply to be permitted to remain in the general population at RJD. It is undisputed, however, that Turner's behavior on January 15, 2020 was disruptive to other inmates and staff. Indeed, the disruption caused when Turner first came into the program office, carrying all his

22

belongings, was the reason a mental health evaluation was sought in the first place. As discussed above, given Turner's outbursts, allowing him to remain in the general population of inmates would likely have been detrimental to maintaining order. Even after he was transferred to the MHCB, his behavior was disruptive. On one occasion he climbed on a table and would not get down until the Warden intervened. Def.'s Ex. B at 96. Therefore, the third *Turner* factor weighs in favor of both Williams and Oldroyd.

### d. Absence of Ready Alternatives

Under the fourth and final *Turner* factor—whether the challenged regulation is an "exaggerated response" to the prison's concerns—Plaintiff must show there are "obvious, easy alternatives" to the regulation that "fully accommodate the prisoner's rights at de minimis cost to valid penological interests." *Turner*, 482 U.S. at 90–91. The burden is on the Plaintiff to show that there are obvious and easy alternatives to the challenged policy. *Mauro*, 188 F.3d at 1062. "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 91. Instead, the proper inquiry is "whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal." *Overton v. Bazzetta*, 539 U.S. 126, 135–36 (2003). Here, Turner fails to suggest an obvious or easy alternative to being transferred to MHCB for mental healthcare. The undisputed evidence shows Turner's behavior was disruptive and indicated a need for a mental health intervention. Because Turner has neither argued nor provided evidence to show there existed an alternative with de minimis costs to valid penological interests, the fourth factor weighs in favor of Williams and Oldroyd.

### 5. Conclusion

Based on the foregoing, the Court finds all four *Turner* factors weigh in favor of Williams and Oldroyd. The Court therefore concludes the there is no triable issue as to whether Plaintiff's transfers for mental healthcare was reasonably related to legitimate

penological interests. Williams and Oldroyd are entitled to summary judgment.[10]

## V.     CONCLUSION AND ORDER

IT IS HEREBY ORDERED that the Court GRANTS Defendants' motion for summary judgment (ECF No. 47) pursuant to Fed. R. Civ. P. 56(a) and DIRECTS the Clerk of the Court to enter judgment in favor of Defendants K. Williams and J. Oldroyd.

Dated:  September 9, 2022

Hon. William Q. Hayes
United States District Court

---

[10] Because the Court has found no triable issue as to whether Turner's First Amendment rights were violated, the Court finds it is unnecessary to determine whether Williams and Oldroyd are entitled to qualified immunity based on clearly established law. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).